IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:15-CT-3251-FL

| | | |
|---|---|---|
| ANTONIO MEDRANO ORTIZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE T. SOLOMON, PAULA | ) | ORDER |
| SMITH, MONICA BOND, CARLTON | ) | |
| JOYNER, DONNIE RAYNOR, DR. | ) | |
| METIKO, WILLIAM ELDERDICE, | ) | |
| RODNIQUE RIVERS, MATTHEW | ) | |
| BAUM, DR. McKENZIE, NURSE | ) | |
| GODDARD, OFFICER OBI, and SGT. | ) | |
| THAYER, | ) | |
| | ) | |
| Defendants.[1] | ) | |

This matter is before the court on defendants' motions for summary judgment (DE 91, 98, 120), filed pursuant to Federal Rule of Civil Procedure 56. The motions were fully briefed and thus the issues raised are ripe for decision. For the reasons stated below, the court grants the motions.

## STATEMENT OF THE CASE

On September 28, 2015, plaintiff, a state inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging claims for deliberate indifference to serious medical needs and excessive force in violation of the Eighth Amendment. Plaintiff also alleges defendants

---

[1]Plaintiff's original complaint named numerous unidentified prison administrators and medical personnel as defendants. The court dismissed the unidentified defendants and previously-named defendants D. Davis and Jessica Reid in separate orders. (DE 24, 72, 74). Additionally, the parties' summary judgment briefing provides that the correct spelling of defendant Raynor's name is "Donnie Raynor." The court has constructively amended the case caption to reflect this change, and the court DIRECTS the clerk to update the caption on the docket.

debited medical co-payments from his inmate trust account, in violation of the Fourteenth Amendment's Due Process Clause. As relief, plaintiff seeks compensatory and punitive damages, and an injunction directing DPS to refund medical co-pay fees assessed to his inmate trust account and to remove any pending medical charges.

On October 15, 2015, plaintiff filed motion to appoint counsel. On March 29, 2016, the court denied the motion to appoint counsel and conducted its frivolity review of plaintiff's complaint. The March 29, 2016, order directed plaintiff to file particularized complaint identifying the correct defendants and explaining how such defendants violated his rights. Plaintiff timely filed his particularized complaint on May 13, 2016. On August 4, 2016, the court conducted its frivolity review of plaintiff's particularized complaint, and directed plaintiff to file second amended particularized complaint ("SAC"). The August 4, 2016, frivolity order explained that any claims that accrued before December 28, 2012, were time barred, and thus directed plaintiff not to include such claims in the SAC.

Plaintiff filed the SAC on September 2, 2016. On December 15, 2016, the court conducted its frivolity review of the SAC and allowed the matter to proceed as to the following defendants: George Solomon ("Solomon"), the North Carolina Department of Public Safety ("DPS") Director of Prisons; Paula Smith ("Smith"), director of the Medical Utilization Review Board; Monica Bond ("Bond"), DPS chief disciplinary hearing officer; Carlton Joyner ("Joyner"), warden of Central Prison; Donnie Raynor ("Raynor"), DPS disciplinary hearing officer; Dr. Metiko ("Metiko"), DPS physician at Central Prison; William Elderdice ("Elderdice"), DPS corrections officer; Rodnique Rivers ("Rivers"), DPS corrections officer; Matthew Baum ("Baum"), DPS corrections officer; Dr. McKenzie ("McKenzie"), DPS contract physician; and Nurse Goddard ("Goddard"), DPS health

services assistant. The court dismissed all claims asserted against the remaining defendants named in the SAC without prejudice.

On March 6, 2017, plaintiff filed motion for reconsideration of the court's March 29, 2016, order denying his motion to appoint counsel. The court denied the motion for reconsideration on March 10, 2017.

On March 31, 2017, defendants Reid and McKenzie filed answer and motion to dismiss. On April 7, 2017, defendant Metiko filed answer and motion for summary judgment limited to plaintiff's failure to exhaust administrative remedies, or in the alternative motion to dismiss. These motions were fully briefed. Plaintiff also filed second motion to appoint counsel on May 25, 2017. On January 22, 2018, the court entered order granting in part and denying in part defendants Reid, McKenzie and Metiko's motions, which dismissed plaintiff's official capacity claims for monetary damages against defendant Metiko and all claims against defendant Reid. The court also dismissed plaintiff's state-law claims for medical negligence. Plaintiff was allowed to proceed with his remaining claims. The court denied plaintiff's second motion to appoint counsel in that same order.

In the interim, counsel for the DPS defendants filed notice of defendant Davis's death on April 11, 2017. The partes did not file motion for substitution of proper party within the time frame set forth in Federal Rule of Civil Procedure 25, and thus the court dismissed plaintiff's claims against defendant Davis on July 17, 2017.

On June 12, 2017, defendants Baum, Bond, Raynor, Elderdice, Goddard, Joyner, Rivers, Smith, and Solomon filed answer. On February 27, 2018, after resolution of the pending motions described above, the court entered case management order governing discovery and dispositive motions practice. On April 30, 2018, plaintiff filed motion to amend the SAC, which sought leave

to add the following DPS corrections personnel as defendants: officer Obi ("Obi"), sergeant Thayer ("Thayer"), and officer Ebson ("Ebson"). On June 5, 2018, the court granted plaintiff leave to amend the SAC to add defendants Obi and Thayer, but denied the motion as to Ebson. The parties completed discovery on or about July 2, 2018.

On August 2, 2018, defendant Metiko filed the instant motion for summary judgment, arguing the record evidence establishes he was not deliberately indifferent to plaintiff's medical needs. In support of the motion, defendant Metiko filed memorandum of law, statement of material facts, and appendix. The appendix included defendant Metiko's affidavit, and numerous medical and disciplinary records. Plaintiff responded in opposition to defendant Metiko's motion on September 24, 2018. Plaintiff's response included statement of disputed material facts, plaintiff's affidavit, memorandum of law, and plaintiff's medical and disciplinary records. Defendant Metiko filed reply to plaintiff's response on October 1, 2018.

Defendant McKenzie filed the instant motion for summary judgment on August 2, 2018, arguing the record evidence establishes she was not deliberately indifferent to plaintiff's medical needs. In support of the motion, defendant McKenzie filed memorandum of law, statement of material facts, and appendix. The appendix included affidavits of defendant McKenzie and third-party Lyda Szczech, McKenzie and Szczech's curriculum vitae's, and plaintiff's medical records. Plaintiff responded in opposition to defendant McKenzie's motion on September 24, 2018. Plaintiff's response included statement of disputed material facts, plaintiff's affidavit, memorandum of law, and plaintiff's medical and disciplinary records.

On October 16, 2018, plaintiff filed his third motion to appoint counsel. The court denied the motion on November 9, 2018.

4

On November 5, 2018, the DPS defendants[2] filed the instant motion for summary judgment, arguing the record evidence establishes they did not violate plaintiff's Eighth and Fourteenth Amendment rights. In support of the motion, DPS defendants filed memorandum of law, statement of material facts, and appendix. The appendix included affidavits of defendants Elderdice, Rivers, Baum, Goddard, and third-party witness Michelle Hartley, pertinent DPS use of force policies, and plaintiff's medical and disciplinary records. Plaintiff responded in opposition on December 17, 2018. Plaintiff's response included memorandum of law, statement of material facts, and plaintiff's affidavit, plaintiff's medical and disciplinary records, a photograph of plaintiff's injuries, and pertinent DPS policies and procedures.

## STATEMENT OF FACTS

The court recounts the facts in the light most favorable to plaintiff. During the relevant time period, plaintiff was serving a state term of imprisonment at Central Prison in Raleigh, North Carolina. (SAC (DE 19) § V.7).[3]

A.    Medical Claims

Plaintiff was diagnosed with renal failure in 2010.[4] (Id. § V.4). DPS transferred plaintiff to Central Prison in June 2014 to undergo dialysis treatment. (Id. § V.7). Plaintiff, however, repeatedly refused dialysis treatment after his transfer to Central Prison despite medical providers' warnings that such refusal could cause death. (Metiko Aff. (DE 94-1) ¶¶ 7-8; McKenzie Aff. (DE

_____

[2]For ease of reference, the court refers to the non-medical defendants – Solomon, Smith, Bond, Joyner, Raynor, Elderdice, Rivers, Baum, Goddard, Obi, and Thayer – collectively as the "DPS Defendants."

[3]Citations to the SAC refer the SAC's section number, followed by the paragraph number plaintiff provided in the section.

[4]Plaintiff's original complaint and first amended complaint alleged claims for deliberate indifference to serious medical needs related to his diagnosis of renal failure, but, as explained above, the court dismissed such claims as barred by the statute of limitations. (See Aug. 4, 2016, order (DE 16) at 2-3).

103-1) ¶¶ 20-22).

The SAC alleges defendants Metiko and McKenzie were deliberately indifferent to plaintiff's serious medical needs. During the relevant time period, defendant Metiko was the medical director at Central Prison Healthcare Complex and the defendant McKenzie was a contract nephrologist who provided medical care for patients in DPS custody with kidney disease. (Metiko Aff. (DE 94-1) ¶ 7; McKenzie Aff. (DE 103-1) ¶ 3).

Plaintiff's precise claims against defendants Metiko and McKenzie have been difficult to identify. In a November 27, 2015, grievance, plaintiff alleged that the light in his room at Central Prison was always on, which caused difficulty sleeping, his food was "not regular," the shower was too cold, his feet were numb due to lack of recreation time, and he was not given clean bedding or clothing. (Couch Aff., Ex. F (DE 52-1) at 26).[5] Plaintiff reported his complaints to defendant Metiko, who responded by stating "you [are] going to die in that room." (SAC (DE 19) § V.12-.13; Pl.'s Aff. (DE 108) ¶ 13). Additionally, plaintiff generally alleges that he developed end-stage renal failure because DPS medical providers failed to treat his hypertension and kidney disease. (Id. § V.21).

Defendant Metiko testified that he was not plaintiff's primary medical provider because he was the medical director at Central Prison. (Metiko Aff. (DE 94-1) ¶ 7). Defendant Metiko, however, met with plaintiff on several occasions to encourage him to undergo dialysis treatment. (Id. ¶¶ 8, 10, 49). Defendant Metiko also requested a psychological evaluation to determine whether

---

[5]Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

plaintiff was competent to refuse treatment.[6]  (Id. ¶ 8).

On or about December 3, 2015, defendant Metiko and other DPS officials met with plaintiff about the allegations raised in his November 27, 2015, grievance, and attempted to resolve the issues concerning recreation time, food quality, clothing, shower temperature, and any other complaints. (Id. ¶¶ 46-49).  As to the recreation time, defendant Metiko explained that plaintiff could not participate because he was at risk of experiencing a medical emergency during recreation.  (Id. ¶ 46). To address the numbness in his feet, defendant Metiko ordered that plaintiff be permitted to ambulate on the unit.  (Id.)  Defendant Metiko also consulted with DPS officials about the light in plaintiff's room and the cleanliness of plaintiff's clothing and bedding.  The night light in plaintiff's room could not be turned off pursuant to DPS policy, and plaintiff was informed of such.  (Id. ¶ 48). DPS officials also confirmed that they were providing plaintiff with regular changes of clothes and clean bedding upon request.  (Id. ¶ 47).  Defendant Metiko explained that plaintiff needed to address his clothing/bedding issues with DPS custody officials and plaintiff verbalized understanding.  (Id.) With respect to plaintiff's complaints about his food, defendant Metiko explained that plaintiff could return to a regular diet he would start dialysis treatment.  (Id. ¶ 49).

Defendant McKenzie is a DPS contract physician who specializes in nephrology, and she treated plaintiff for his renal failure beginning in February 2012.  (McKenzie Aff. (DE 103-1) ¶¶ 2-4).  In June 2014, plaintiff allegedly informed defendant McKenzie about his hypertension, headaches, dizziness, muscle cramps, swollen legs, and chest pains.  (SAC (DE 19) § V.7). Defendant McKenzie attempted to treat plaintiff's symptoms, but the treatment was unsuccessful, and she eventually referred plaintiff to a cardiologist.  (Id.)  In June 2015, plaintiff was having

---

[6]At least two psychiatrists have evaluated plaintiff and found him competent. (McKenzie Aff. (DE 103-1) ¶ 11).

similar symptoms, and also began experiencing pain in his dialysis arm. (Id. § V.9). Plaintiff informed defendant McKenzie about these symptoms as well, but she would only prescribe Ibuprofen for the pain. (Id.) In his affidavit, plaintiff similarly testified that defendant McKenzie failed to treat his chronic pain issues "for over a year" but eventually prescribed him Ibuprofen. (Pl's Aff. (DE 111) ¶¶ 13-14). The Ibuprofen, however, caused plaintiff to have bloody stools. (Id. ¶¶ 15, 21-24). Plaintiff also alleges defendant McKenzie should not have prescribed Ibuprofen due to plaintiff's numerous health problems, including cardiovascular disease, blood clots, renal failure, and hypertension. (Id. ¶¶ 16-20, 54).

Defendant McKenzie testified that during the time she treated plaintiff he repeatedly refused treatment for his chronic kidney disease, including dialysis, and medications for his hypertension. (McKenzie Aff. (DE 103-1) ¶¶ 5, 7-8, 12, 16-18). Plaintiff also continued to take Ibuprofen despite contraindication for patients with severe kidney disease and instruction from defendant McKenzie that he should not take the medication. (Id. ¶¶ 4, 6). In 2013, defendant McKenzie saw plaintiff approximately monthly, and attempted each time to convince plaintiff to comply with his treatment regimen. (Id. ¶ 18). Plaintiff finally consented to dialysis treatment in August, 2014. (Id. ¶ 19). Although plaintiff continues to refuse treatment at times, his hypertension is controlled if he complies with dialysis. (Id. ¶ 20). Defendant McKenzie also prescribed Ibuprofen for plaintiff after he started dialysis, because Ibuprofen is safe if the patient is on dialysis. (Id.)

Plaintiff also alleges defendant Goddard was deliberately indifferent to his serious medical needs. Defendant Goddard is a correctional health assistant employed at Central Prison. (Goddard Aff. (DE 125-11) ¶ 3). In July 2016, she was responsible for administering medications to plaintiff. (Id. ¶ 6). Defendant Goddard testified she always administered the medications exactly as they were

prescribed, and attached medical records documenting each administration. (Id. ¶¶ 9-10 & Ex. A). Plaintiff, however, testified defendant Goddard failed to administer his blood pressure medication and did not provide an ice pack after his dialysis on July 21, 2016. (Pl.'s Aff. (DE 132-1) ¶¶ 58-59).

B.      Use of Force Incidents

On October 15, 2015, officer Davis was escorting plaintiff to the Central Prison medical unit. (Pl.'s Aff. (DE 132-1) ¶ 10). During the escort, plaintiff realized his personal property had been left in his housing unit. (Id.) The property included legal books and other personal items which were "very important" to plaintiff. (Id. ¶ 12). Upon arrival on the medical unit, prison officials informed plaintiff he would be housed there for the time being. (Id. ¶ 13). Plaintiff became "preoccupied" about his personal property and asked officer Davis if someone could return to his previous housing unit and retrieve it. (Id. ¶¶ 15, 17). Officer Davis initially ignored plaintiff, but when plaintiff's requests persisted, he placed one of his fingers to his lips, which plaintiff interpreted as "telling me to 'shut up.'" (Id. ¶ 17). Plaintiff then stood up "to get some attention" and "raised my voice a little bit." (Id. ¶ 18). At the time, however, plaintiff was "fully restrained" and did not threaten or otherwise resist officer Davis. (Id.) Nevertheless, officer Davis, defendants Rivers and Obi, and another unidentified officer "slammed (not placed) me onto the hard concrete floor mouth first busting my lips open."[7] (Id.) Plaintiff's injured lips "never quite healed" until he had surgery in February 2017. (Id. ¶ 20).

Defendant Raynor charged plaintiff with an unidentified disciplinary offense related to the October 15, 2015, incident. (Id. ¶ 49). Plaintiff was convicted of the disciplinary offense and sentenced to 180 days of segregation and a $10 fine. (Id.) Defendant Bond, the chief disciplinary

---

[7]Defendants could not retrieve a video recording of the incident due to a technical failure. (Pl.'s Exs. (DE 108-2) at 27-28).

hearing officer, affirmed plaintiff's conviction and sentence on appeal. (Id. ¶¶ 49, 51).

On October 24, 2015, plaintiff was partially nude and cleaning himself with a washcloth. (Id. ¶¶ 21-23). Defendant Rivers approached plaintiff's cell and called his name. (Id. ¶ 26). Plaintiff did not answer because he believed defendant Rivers could see him. (Id.) Defendant Rivers entered plaintiff's cell, announced he was there to complete "count" and approached plaintiff with pepper spray. (Id. ¶¶ 26-27). Plaintiff "demanded" defendant Rivers leave his cell. (Id. ¶ 28). Defendant Rivers responded, "I [will] beat your [expletive] like the last time[,]" and left the cell. (Id.)

A short time later, defendant Rivers returned to plaintiff's cell with defendants Elderdice and Baum. (Id. ¶ 30). Defendants Rivers and Elderdice entered the cell, and ordered plaintiff to submit to handcuffs. (Id. ¶ 32). Plaintiff peacefully allowed defendants Rivers and Elderdice to handcuff him, but "when defendant Elderdice placed the handcuffs on me, he placed it so tight on my already painful and swollen little arm that my entire body [became numb]." (Id. ¶¶ 32, 34). Plaintiff explained that the handcuffs were too tight, but defendants Elderdice and Rivers refused to loosen them. (Id. ¶ 35).

Defendants Rivers, Baum, and Elderdice escorted plaintiff to an elevator, where they pushed him against the elevator's back wall. (Id. ¶ 36). Plaintiff tried to shift his hands into a more comfortable position, but defendant Elderdice twisted plaintiff's left arm, causing significant pain. (Id.) Plaintiff's "body reacted to the pain" and "defendant Rivers [accidentally] got hit." (Id.; Pl.'s Mem. (DE 130) at 4-5). Defendant Rivers responded by punching plaintiff "several times." (Pl.'s Aff. (DE 132-1) ¶ 37). Additionally, defendants Elderdice and Rivers threw plaintiff to the elevator floor, and defendant Rivers placed his foot on plaintiff's neck. (Id.) Plaintiff was then "dragged"

to a holding cell, and "after they were off camera" defendants Elderdice, Rivers, and Baum threw plaintiff to the ground and kicked him several times.[8] (Id. ¶¶ 37-38).

A few hours after this incident, defendant Thayer and other officers dragged plaintiff to the mental health unit, where a nurse administered involuntary psychotropic medications. (Id. ¶¶ 43-44). Defendant Thayer and other officers then dragged plaintiff, completely nude, to the mental health unit, and plaintiff began vomiting and having chest pain and diarrhea. (Id. ¶¶ 45-46). DPS medical personnel, however, screened plaintiff after the October 24, 2015, incident, but plaintiff denied any injuries and "no acute distress was noted." (Hartley Aff., Ex. A (DE 125-9) at 5).

Defendant Raynor also charged plaintiff with an unidentified disciplinary offense related to the October 24, 2015, incident. (Pl.'s Aff. (DE 132-1) ¶ 52). Plaintiff was convicted and sentenced to 180 days segregation and a $10 fine. (Id.)

## DISCUSSION

A.    Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of his pleading" but "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248-49; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The

---

[8]The parties also did not produce a video recording of the October 24, 2015, incident.

nonmoving party thus "bears [the] burden of showing, by means of affidavits or other verified evidence, that [a] genuine dispute of material fact exists." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

B.     Analysis

1.     Medical Claims

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (1996). "In order to make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotation omitted). The first prong is objective – the prisoner must show that "the deprivation of [a] basic human need was objectively sufficiently serious." Id. (internal quotation omitted). In the medical context, a basic human need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quoting Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999)).

The second prong is subjective – the prisoner must show that "subjectively the officials acted with a sufficiently culpable state of mind." See Strickler, 989 F.2d at 1379 (internal quotations omitted). The mental state for "deliberate indifference entails something more than negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of

12

causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). "It requires that a prison official know of and disregard the objectively serious condition, medical need, or risk of harm." Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995); see Farmer, 511 U.S. at 837. A plaintiff therefore must establish the prison official's "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (citing Farmer, 511 U.S. at 837–39). The subjective knowledge requirement can be proved "through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge . . . ." Scinto v. Stansberry, 841 F.3d 219, 225–26 (4th Cir. 2016).

Deliberate indifference is thus "a particularly high bar to recovery." Iko, 535 F.3d at 241. For claims involving medical care, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Negligence or medical malpractice in diagnosis or treatment are not exceptional circumstances. See id.; see also Estelle v. Gamble, 429 U.S. 97, 105–08 (1976).

Here, plaintiff has not established defendants Metiko or McKenzie were deliberately indifference to his serious medical needs. As set forth in detail above, defendant Metiko and McKenzie repeatedly attempted to treat plaintiff's kidney disease, but plaintiff refused treatment despite numerous warnings that his failure to accept treatment could lead to his demise. (Metiko Aff. (DE 94-1) ¶¶ 7-8; McKenzie Aff. (DE 103-1) ¶¶ 20-22). Where the record demonstrates defendants closely monitored plaintiff's conditions and attempted to provide medical care, but plaintiff refused, he cannot establish an Eighth Amendment violation. See Wright, 766 F.2d at 849

(holding disagreements between a medical provider and inmate regarding the proper course of treatment do not state a claim for deliberate indifference to serious medical needs); Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986) ("A review of the record demonstrates that [the plaintiff] received substantial medical treatment and that the basis of the claim against the medical personnel defendants is a contention of negligence under tort law principles rather than a contention of deliberate indifference under constitutional law principles.")

Plaintiff's also alleges defendant Metiko failed to ensure plaintiff had clean bedding, clean clothes, that the light in his cell was turned off at night, that his shower temperature was sufficiently warm, and failed to treat his foot numbness by providing access to outdoor recreation time. As set forth above, however, defendant Metiko met with plaintiff to address these issues. (Metiko Aff. (DE 94-1) ¶¶ 46-49). Defendant Metiko tested the shower temperature, and referred plaintiff's concerns about his bedding, clothes, and the lighting in his cell to the relevant DPS custody officials. (Id. ¶ 47). Defendant Metiko also ordered that plaintiff be permitted to ambulate on the medical unit to address his issues with foot numbness.[9] (Id. ¶ 46). Where defendant Metiko responded to plaintiff's complaints about his housing conditions and attempted to resolve each of them, plaintiff cannot establish deliberate indifference to harmful prison conditions. See Shakka, 71 F.3d at 166 (deliberate indifference requires showing defendant knew of and disregarded objectively serious condition, medical need, or risk of harm).

As to defendant McKenzie, plaintiff's nephrologist, plaintiff alleges she failed to treat his hypertension, headaches, dizziness, and muscle cramps. But plaintiff's own allegations demonstrate that defendant McKenzie attempted to treat these issues. (SAC (DE 19) § V.7). When such

_____

[9]As noted, plaintiff was not permitted to attend outside recreation because he refused dialysis treatment. (Metiko Aff. (DE 94-1) ¶ 46).

treatment was unsuccessful, defendant McKenzie referred plaintiff to a cardiologist. (Id.) Where defendant McKenzie attempted to treat plaintiff's medical problems but the treatment was allegedly ineffective, the claim is at most one of medical negligence, not deliberate indifference. See Sosebee, 797 F.2d at 181; Wright, 766 F.2d at 849.

Plaintiff's allegations that defendant McKenzie failed to treat his chronic pain and prescribed Ibuprofen when such medication is contraindicated for patients with kidney disease fare no better. As set forth above, the record belies plaintiff's conclusory assertions that defendant McKenzie failed to treat plaintiff's pain or other health conditions. (See McKenzie Aff. (DE 103-1); Pl.'s Medical Records (DE 103-5)). The medical records also document that plaintiff continued to take Ibuprofen on his own despite the defendant McKenzie's warnings that it would damage his kidneys. (Id. ¶¶ 4, 6). While it is true defendant McKenzie prescribed Ibuprofen after plaintiff entered end-stage renal failure and began dialysis, she did so because Ibuprofen is no longer harmful once the patient is on dialysis.[10] (Id. ¶ 20). As noted, mere disagreement between plaintiff and his medical providers about the appropriate standard of care does not state a claim for deliberate indifference to serious medical needs. Jackson, 775 F.3d at 178; Wright, 766 F.2d at 849.

Plaintiff's final medical claim is that defendant Goddard did not provide an ice pack after his dialysis on July 21, 2016, and also failed to dispense his blood pressure medication that same day. The medical records attached to defendant Goddard's affidavit establish plaintiff received his blood pressure medication on July 21, 2016. (See Goddard Aff., Ex. A (DE 125-12)). But even

---

[10]Plaintiff also repeatedly asserts that taking the Ibuprofen caused bloody stools and should not have been prescribed in light of plaintiff's hypertension, cardiovascular disease, blood clots, and other symptoms. But there is no evidence, beyond plaintiff's conclusory assertions, that defendant McKenzie did not exercise her best medical judgment when she prescribed the medication. Nor is there any evidence that plaintiff made defendant McKenzie or any other medical provider aware of his concerns.

assuming plaintiff was not provided one dose of his blood pressure medication or a required ice

pack, such action does not rise to the level of deliberate indifference to serious medical needs absent

a showing that defendant Goddard knew one missed medication administration would result in

serious risk of harm.  See Jackson, 775 F.3d at 178 (noting deliberate indifference "is a higher

standard of culpability than mere negligence or even civil recklessness"); Zentmyer v. Kendall

Cnty., Ill., 220 F.3d 805, 811-12 (7th Cir. 2000) (holding that prison officials failure to dispense five

doses of Amoxicillin out of thirty was not deliberate indifference to serious medical needs in

absence of evidence that defendants knew the plaintiff "might suffer serious injury or pain from the

missing doses of medication"); Mahan v. Plymouth Cnty. House of Corr., 64 F.3d 14, 18 (1st Cir.

1995).  Plaintiff has not shown that one missed dose of his blood pressure medication or the ice pack

would result in serious risk of harm, or that defendant Goddard was aware of same.

    2.    Excessive Force Claims

Plaintiff also alleges defendants Rivers, Obi, Elderdice, and Baum used excessive force

against him in violation of the Eighth Amendment.  The Eighth Amendment prohibits the

"unnecessary and wanton infliction of pain" which constitutes cruel and unusual punishment.

Whitley v. Albers, 475 U.S. 312, 319 (1986).  The excessive force inquiry has an objective prong

and a subjective prong.  Under the objective prong, a plaintiff must establish that the forced used

was "nontrivial."  Wilkins v. Gaddy, 559 U.S. 34, 39 (2010).  "An injury is sufficiently serious for

purposes of the objective component of an Eighth Amendment excessive force claim as long as it

rises above the level of de minimus harm."  Iko, 535 F.3d at 238; see also Hudson v. McMillian, 503

U.S. 1, 9-10 (1992).

To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 297 (1991). For an excessive force claim, the relevant state of mind is "wantonness in the infliction of pain." Whitley, 475 U.S. at 321-22. Although "[a]n express intent to inflict unnecessary pain is not required" to establish an excessive force claim under the Eighth Amendment, an inmate must show that the defendant inflicted unnecessary and wanton pain and suffering. Id. at 319. In determining whether a prison official has acted with "wantonness," relevant factors include: 1) the need for the application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. Whitley, 475 U.S. at 321; Hudson, 503 U.S. at 7. "The core judicial inquiry . . . [is] not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins, 559 U.S. at 37 (quotations omitted).

As set forth above, on October 15, 2015, defendants Rivers and Obi, and two additional officers, allegedly used excessive force when they "slammed" plaintiff to the floor, causing significant injury to his lip. Plaintiff's version, which the court accepts as true, is that officer Davis initially ignored plaintiff's requests to return to his housing unit to retrieve his personal property. (Pl.'s Aff. (DE 132-1) ¶ 17). When plaintiff's requests persisted, officer Davis placed a finger over his lips, which plaintiff interpreted as "telling me to 'shut up.'" (Id.) Plaintiff then stood up "to get some attention" and "raised" his voice. (Id. ¶ 18). Officer Davis, defendants Rivers and Obi, and an unidentified officer then approached plaintiff, and "slammed" him on the floor. (Id.)

The court begins with the first and third <u>Whitley</u> factors: the need for application of force and the officers' perception of risk to their safety. Plaintiff admits officer Davis placed his finger over his lips, which plaintiff interpreted as instruction to calm down and lower his voice.[11] (<u>Id.</u> ¶ 17). Plaintiff disregarded this instruction, and instead stood up, faced the officers, and "raised" his voice. (<u>Id.</u> ¶ 18). Additionally, plaintiff was able to stand from his chair and the officers subsequently "slammed" him to the floor, which belies his conclusory assertion that he was "fully restrained" before the altercation.[12] (<u>Id.</u>) The court accepts as true plaintiff's testimony that he did not move toward the officers, but where a prisoner stands up, faces the officers, and raises his voice, all in defiance of instruction to calm down, the officers reasonably may interpret such actions as a threat to their safety. And this is particularly true where it appears plaintiff's legs were not restrained, plaintiff's access to the officers was unimpeded, and plaintiff thus could have charged toward the officers. <u>See</u> <u>Williams</u>, 77 F.3d at 762-63 (holding officers reasonably perceived threat to safety where plaintiff failed to obey commands to stop throwing liquids from his cell, even though plaintiff was confined inside the cell). The first and third <u>Whitley</u> factors thus weigh in favor of finding the use of force was a good faith effort to maintain or restore discipline.

The second and fourth <u>Whitley</u> factors address the relationship between the need for application of force and the amount used, and any efforts made to temper the severity of a forceful response. Here, plaintiff alleges he was "slammed" to the floor, but that no other force was used. While "slamming" plaintiff to the floor was a somewhat aggressive response, officer Davis

---

[11]Defendant Rivers has a different recollection of this incident. Defendant Rivers testified that plaintiff became irate after he discovered he was going to be housed in the medical unit, and began moving toward officer Davis in an aggressive manner. (Rivers Aff. (DE 125-6) ¶ 10-11).

[12]In the SAC, plaintiff alleged his hands were "handcuffed" behind his back but does not allege his feet or legs were restrained. (SAC (DE 19) § V.11).

previously had instructed plaintiff to calm down (when he placed his finger over his lips), but plaintiff refused. In these circumstances, the court finds the use of force was not a disproportionate response, particularly in light of the deference prison officials should be afforded in tense, uncertain situations. See, e.g., Graham v. Connor, 490 U.S. 386, 396-97 (1989) (explaining that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation" and courts must take that circumstance into account when considering whether a constitutional violation occurred); Grayson v. Peed, 195 F.3d 692, 696 (4th Cir. 1999) ("In dealing with such agitated detainees prison officials must not be forced to walk a tightrope and face the prospect of a lawsuit [for either excessive force or failing to protect an inmate from harming himself] no matter which way they turn.").

Taken as a whole, the Whitley factors do not suggest defendants Rivers and Obi's use of force was excessive under the circumstances. The court therefore grants the DPS defendants' motion for summary judgment as to the October 15, 2015, incident.

Turning to the October 24, 2015, incident, plaintiff testified (and the court accepts his version as true) that he refused to appear for "count" and thus defendants Rivers, Baum, and Elderdice entered his cell and placed him in handcuffs. (Pl.'s Aff. (DE 132-1) ¶¶ 26-32). The officers escorted plaintiff to an elevator, and defendants Elderdice and Rivers pushed plaintiff against the back wall. (Id. ¶¶ 35-36). Plaintiff tried to shift his hands into a more comfortable position, but defendant Elderdice twisted plaintiff's left arm, causing significant pain. (Id. ¶ 36). Plaintiff's "body reacted to the pain" and "defendant Rivers [accidentally] got hit." (Id.; Pl.'s Mem. (DE 130) at 5). Defendant Rivers responded by punching plaintiff "several times." (Pl.'s Aff. (DE

132-1) ¶ 37).  Additionally, defendants Elderdice and Rivers threw plaintiff to the elevator floor, and defendant Rivers placed his foot on plaintiff's neck.  (Id.)  At some unidentified time after the plaintiff and the officer left the elevator, plaintiff alleges he was thrown to the ground and "kicked" several times at an unidentified time after they exited the elevator.  (Id. ¶ 38).

As to the initial use of force in the elevator, the <u>Whitley</u> factors all weigh in favor of defendants.  Plaintiff admits that he struck defendant Rivers when they were in the elevator. Defendants Elderdice, Rivers and Baum thus reasonably perceived an imminent risk to officer safety.  Additionally, punching plaintiff "several times" and throwing him to the ground in an effort to restrain him are not disproportionate responses given the risk to officer safety.  <u>See</u> <u>Grayson</u>, 195 F.3d at 694, 696 (holding officers did not use excessive force when five-man cell extraction team pinned plaintiff down and punched plaintiff seven to nine times "during the course of the struggle" where inmate posed immediate threat to officer safety).

Plaintiff also alleges in conclusory fashion that he was thrown to the ground and kicked multiple times after the parties exited the elevator.  Plaintiff, however, provides no additional detail about this incident, such as precisely when or where it occurred, or whether plaintiff was resisting the officers at the time.  Plaintiff's conclusory assertions that defendants used excessive force after they exited the elevator are not sufficient to defeat defendants' motion for summary judgment.[13]  <u>See</u> <u>Thompson v. Potomac Elec. Power Co.</u>, 312 F.3d 645, 649 (4th Cir. 2002) (conclusory allegations,

_____

[13]Plaintiff also did not identify a separate claim for use of force outside of the elevator in his complaint.  Plaintiff cannot amend the complaint to add additional allegations in response to a motion for summary judgment, particularly where discovery is closed and dispositive motions have been filed.  <u>See</u> <u>Barclay White Skanska, Inc. v. Battelle Mem'l Inst.</u>, 262 F. App'x 556, 563 (4th Cir. 2008) ("[D]espite the liberal pleading rules outlined by the Supreme Court, plaintiffs may not raise new claims without amending their complaints after discovery has begun."); <u>see also</u> <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

or "a mere scintilla of evidence," are not sufficient to defeat summary judgment).

Alternatively, the court finds plaintiff's allegations related to the October 24, 2015, incident are so belied by the record that no rational jury could believe his version of these events. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." See Scott v. Harris, 550 U.S. 372, 380 (2007). After the October 24, 2015, altercation, plaintiff was evaluated by medical staff, and he "denied any injuries" and medical professionals noted plaintiff was not in acute distress. (Hartley Aff., Ex. A (DE 125-9) at 5). If plaintiff were assaulted in the manner described in his affidavit, it defies logic that he would have sustained no injuries and not have been in any distress after the incident. Accordingly, the court finds plaintiff cannot establish that a rational jury would find the October 24, 2015, incident occurred in the manner plaintiff describes. And defendant Rivers' version of the altercation establishes that the use of force was a good faith effort to maintain and restore discipline. (See Rivers Aff. (DE 125-6) ¶¶ 16-25).

In sum, plaintiff has not established an Eighth Amendment violation related to the October 24, 2015, altercation.

3. Inmate Trust Account Claims

The SAC alleges defendants improperly deducted medical co-payments from plaintiff's trust fund account, in violation of the Due Process Clause of the Fourteenth Amendment. To state a procedural or substantive due process claim, an inmate must demonstrate that he was deprived of life, liberty, or property by government action. Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997). The court assumes without deciding plaintiff has a property interest in his inmate trust account, and

that wrongful deductions of medical co-payments implicates such interest. Cf. Washlefske v. Winston, 234 F.3d 179, 185 (4th Cir. 2000); Burks v. Pate, 119 F. App'x 447, 450 (4th Cir. 2005). As the Supreme Court has explained, however, even "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post[-]deprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984) (holding that intentional deprivations of property by state employees do not violate due process until and unless the State refuses to provide a suitable post-deprivation remedy); see also Mora v. City of Gaithersburg, Md., 519 F.3d 216, 230-31 (4th Cir. 2008). Here, an adequate post-deprivation remedy is available to plaintiff in state court. See, e.g., Wilkins v. Whitaker, 714 F.2d 4, 6-7 (4th Cir. 1983) (holding North Carolina tort law provides adequate post-deprivation remedy in these circumstances).[14] Accordingly, the DPS defendants are entitled to summary judgment on plaintiff's due process claim.

### 4.    Supervisory Liability

Plaintiff appears to argue certain defendants (particularly defendants Solomon and Smith) violated his Eighth Amendment rights based on a supervisory liability theory. Where plaintiff has failed to demonstrate an underlying constitutional violation, plaintiff cannot establish a claim for supervisory liability. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (holding claim for supervisory liability requires underlying constitutional violation).

### 4.    Additional Claims

---

[14]Additionally, plaintiff has not established that DPS failed to provide him notice or an opportunity to be heard before the co-payments were deducted. Mora, 519 F.3d at 230. Nor has plaintiff explained how deduction of the co-payments is an arbitrary exercise of government action. See id.; Reynolds v. Wagner, 128 F.3d 166, 182 (3d Cir. 1997) (holding policy requiring inmates to pay medical co-payments did not violate substantive due process).

Plaintiff's responses to instant motions allege numerous claims that were not part of the SAC, including the following: 1) defendant Elderdice applied the handcuffs too tightly to plaintiff's wrists during the October 24, 2015, altercation; 2) defendant Thayer dragged plaintiff through Central Prison while plaintiff was nude; 3) defendant Goddard retaliated against plaintiff for filing grievances; 4) defendant Metiko failed to address plaintiff's arm and mouth injuries and permitted excessive force to be used against plaintiff; and 5) plaintiff's due process rights were violated during his disciplinary hearings. As set forth above, plaintiff cannot allege new claims against defendants in response to a motion for summary judgment, particularly where discovery is closed, the dispositive motions deadline expired months ago, and plaintiff was aware of these claims before the deadline set in the scheduling order for filing amended complaint. See Barclay White Skanska, 262 F. App'x at 563; see also Gilmour, 382 F.3d at 1315. The court therefore dismisses such claims without prejudice.

## CONCLUSION

Based on the foregoing, the court GRANTS defendants' respective motions for summary judgment (DE 91, 98, 120). The new claims plaintiff alleged in his responses to the instant motions are dismissed without prejudice. The court DIRECTS the clerk to close this case, and to update the docket caption as set forth above in footnote one.

SO ORDERED, this the 18th day of March, 2019.

LOUISE W. FLANAGAN
United States District Judge